No. 55,599

Douglas E. Cansler, *Plaintiff-Appellant,* v. State of Kansas and Kansas State Penitentiary, *Defendants-Appellants,* v. The Sheriff of Leavenworth County, Kansas; The Leavenworth County Sheriff's Department; and Board of County Commissioners of Leavenworth County, Kansas, *Defendants-Appellees.*

(675 P.2d 57)

Opinion filed January 5, 1984.

*Charles D. Kugler,* of Vasos, Kugler & Dickerson, of Kansas City, argued the cause, and *Thomas E. Osborn,* of Corson & Osborn, P.A., of Kansas City, was with him on the briefs for plaintiff-appellant.

*Steven D. Treaster,* staff attorney, Kansas Department of Corrections, argued the cause, and *Charles E. Simmons,* chief legal counsel, Kansas Department of Corrections, was with him on the brief for defendants-appellants.

*Leo L. Logan,* of Boddington & Brown, of Kansas City, argued the cause and was on the brief for defendants-appellees.

The opinion of the court was delivered by

MILLER, J.: We are presented in this case with interlocutory appeals by the plaintiff, Douglas E. Cansler, and by the defendant State of Kansas, in this personal injury action filed pursuant to the Kansas Tort Claims Act, K.S.A. 1981 Supp. 75-6101 *et seq.* Named defendants are the State of Kansas and the Kansas State Penitentiary, to whom we shall refer collectively as the State; and the Sheriff of Leavenworth County, the Leavenworth County Sheriff's Department and the Board of County Commissioners of Leavenworth County, to whom we shall refer as the County. The primary issues are whether the State and the County owed a duty to the plaintiff under the facts of this case and, if so, whether the acts or omissions of the defendants fall within the exceptions contained in K.S.A. 1981 Supp. 75-6104(*c*), (*d*) or (*m*).

A brief procedural history is necessary to an understanding of the present posture of the case. The State was originally the only named defendant. Its answer alleged that the Sheriff of Leavenworth County, the Leavenworth County Sheriff's Department and the Board of County Commissioners of Leavenworth County should be joined as parties, pursuant to K.S.A. 60-258a(*c*), since their negligence contributed to plaintiff's injuries. The trial court sustained the motion and added the additional parties defendant. Plaintiff amended his petition to state a claim against the County. The County and the State then filed motions to dismiss for failure to state a claim upon which relief could be granted, citing K.S.A. 1981 Supp. 75-6104(*c*), (*d*) and (*m*). The trial court sustained both motions and dismissed the case. Plaintiff next filed a motion for rehearing and for leave to file a second amended

petition. After a hearing, the trial court sustained the motion for leave to file the amended petition as to the State, but denied it as to the County. The second amended petition was filed, with leave of court. Upon application the trial court found that the case involves controlling questions of law, as to which there is substantial ground for difference of opinion, and authorized interlocutory appeals. The plaintiff appeals from the order dismissing his claims as to Leavenworth County, and the State appeals from the trial court's refusal to dismiss plaintiff's claims against it.

This case has not gone to trial and only two depositions are included within the record on appeal. The facts which we recite are either taken from the depositions or are a statement of facts claimed by the plaintiff.

Sometime around the first of September 1981, a complete guard's uniform was missing from the laundry at the Kansas State Penitentiary. Prison officials were aware of this, but the fact that a guard's uniform was in the hands of the inmates was not made known to the prison guards. On Sunday, September 6, 1981, an inmate who had access to the interprison telephone line called Guard Vanderslice, who was on duty in tower No. 12, and told him that he was to be relieved of duty in the tower. Thereafter, an inmate wearing the stolen uniform approached and was admitted into the tower by Vanderslice. Upon gaining entry, the inmate overpowered Vanderslice and let six other prisoners into the tower. They took control of the weaponry in the tower, including two riot guns, one .38-caliber revolver and one .30-.30 rifle. The inmates, all seven of whom were serving life terms for murder, escaped over the prison wall. The escape was effected around 8:30 o'clock a.m.

Other guards who observed the escape were unable to sound an immediate alarm because the general alarm system in the prison, which consisted of a loud horn or siren which would alert everyone within a mile or so of the prison, had not been functional for some years and the available telephones in the prison were "busy." The prison authorities were finally informed of the escape at about 8:40 o'clock a.m. About 9:00 o'clock that morning, the Leavenworth County Sheriff's office received a telephone message from "the captain's office" at the penitentiary that seven inmates had assaulted a guard and taken over a tower,

and that the inmates had access to weapons which were in the tower. The caller asked for help from the sheriff's office and told the dispatcher that the Kansas Highway Patrol had been notified. Within five to ten minutes, the dispatcher on duty at the sheriff's office received a report that a pregnant woman had been held at gunpoint by three men and her car stolen. Within two or three minutes thereafter, the dispatcher received a second call from a local man advising that he had been held at gunpoint and his 1975 Maverick had been taken by three men who were in jail clothing. The victim believed them to be from the penitentiary. The dispatcher alerted various Leavenworth County sheriff's officers and the Leavenworth city police. Though the penitentiary at Lansing is perhaps less than three miles from the Wyandotte County line, the dispatcher did not notify the Wyandotte County sheriff's office. He did prepare a teletype message and entered it into the computer, but the computer was down and therefore the message was never transmitted. Had the computer been in operation, the message would have gone to all other Kansas law enforcement terminals.

Cansler, the plaintiff, was a sergeant on the police force at Bonner Springs, Kansas, about ten miles south of the penitentiary. He was the only police officer on duty that Sunday morning and, at about 9:30 o'clock a.m., he was on routine patrol. He saw a green Maverick automobile pass another vehicle in an unlawful manner, and he turned and gave chase. He could see that the occupants of the Maverick were not wearing shirts, but it was a warm day and this fact did not excite his curiosity. Soon he came upon the Maverick, wrecked and in a ditch, and he saw the occupants fleeing on foot toward a nearby home. Cansler did not see them carrying anything. His only radio contact was with the Wyandotte County sheriff's office. He called the Wyandotte County dispatcher and asked for a backup unit, since the men were fleeing and he surmised that the car might be stolen. He parked, grabbed his shotgun, and carefully went around to the back of the house in which the suspects had apparently taken shelter. He saw that the back door was ajar. He called the dispatcher over his walkie-talkie and advised that the suspects had entered the house and the door had been forced open. Cansler backed away from the doorway, and when he was some fifteen feet away he was struck three times by shots fired from

the high-powered rifle taken by the inmates from the guard tower. Plaintiff sustained severe personal injuries which required hospitalization and lengthy treatment. He has recovered sufficiently to enable him to return to his employment, and he is the present chief of the Bonner Springs police department.

## I. THE STATE'S DUTY

The first issue is whether the State owed the plaintiff a duty to protect him from the escaped convicts, and whether that duty was breached.

Because the defendants in this case are "governmental entities," as defined in K.S.A. 1981 Supp. 75-6102, the provisions of the Kansas Tort Claims Act, K.S.A. 1981 Supp. 75-6101 *et seq.*, are applicable. K.S.A. 1981 Supp. 75-6103(*a*) reads as follows:

"75-6103. . . . (*a*) Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

Before we turn to other provisions of the Tort Claims Act, we must first determine whether the State, "if a private person, would be liable under the laws of this state." We will first review the common law negligence principles applicable to the conduct of private persons. As we recently noted in *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, Syl. ¶ 5, 662 P.2d 243 (1983):

"For negligence to exist there must be a duty and a breach thereof before the conduct becomes actionable. If no duty exists there can be no negligence. Following *Madison v. Key Work Clothes*, 182 Kan. 186, 318 P.2d 991 (1957)."

In *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983), we said:

"Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence. . . . Whether a duty exists is a question of law . . . . Whether the duty has been breached is a question of fact." p. 488.

In Prosser, Law of Torts § 56, pp. 348-50 (4th ed. 1971), we find the following discussion:

"*Controlling Conduct of Others*
"The general duty which arises in many relations to take reasonable precau-

tions for the safety of others may include the obligation to exercise control over the conduct of third persons. Thus the duty of a carrier toward its passengers may require it to maintain order in its trains and stations, and to use reasonable care to prevent not only conduct which is merely negligent, but also personal attacks or thefts of property on the part of other passengers or strangers. A similar obligation rests upon innkeepers toward their guests, upon employers toward their employees, a jailor toward his prisoner, a hospital toward its patients, a school toward its pupils, and in a large number of cases it has been extended to owners of premises who hold them open to business visitors. The list appears to include all those who are under an affirmative duty to render aid, and may possibly include other relations.

"But even in the absence of such a special relation toward the person injured, the defendant may stand in such a relation toward the third person himself as to give him a definite control over his actions, and carry with it a duty to exercise that control to protect the plaintiff. Thus the owner of an automobile is in such a position to control the conduct of one who is driving it in his presence that he is required to act reasonably to prevent negligent driving. An employer must prevent his employees from throwing objects from his factory windows, and this has been extended quite generally to include an obligation on the part of any occupier of premises to exercise reasonable care to control the conduct of any one upon them, for the protection of those outside. The physician in charge of an operation may be liable for failure to prevent the negligence of his assistants. In a New York case, a hospital was held liable for permitting a quack doctor to treat a patient on its premises. The same rule has been applied to those who have taken charge of dangerous lunatics, and logically should apply, in cases where there is recognizable great danger, to those who have charge of criminals. In all such cases, the duty is not an absolute one to insure safety, but requires only reasonable care, and there is no liability when such care has been used, or where the defendant neither knows nor has any reason to know that it is called for."

In finding that the State owed the plaintiff a duty and therefore reinstating the plaintiff's claim against the State, the trial court relied in part upon Restatement (Second) of Torts §§ 315 and 319 (1965). These sections read as follows:

"§ 315. General Principle
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection."
"§ 319. Duty of Those in Charge of Person Having Dangerous Propensities
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

Illustration 2 under section 319 reads:

"2. A operates a private sanitarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and causes harm to C. A is subject to liability to C."

Under section 315(a), a special relation must exist between the actor—the State, in this instance—and the third person—the inmates, in this instance—which imposes a duty upon the State to control the third person's conduct. Under section 319, the State, having charge of the inmates, was under a duty to exercise reasonable care to control the inmates to prevent them from doing bodily harm to others, since the State obviously knew or should have known them to be likely to cause such harm.

We find no cases in this jurisdiction on these precise points, but we find many cases from other jurisdictions which are helpful. The trial court relied in part upon the case of *Christensen v. Epley*, 36 Or. App. 535, 585 P.2d 416 (1978). An inmate of an Oregon youth detention center escaped. A police officer who approached a vehicle stopped on the highway which was occupied by the escapee and her accomplice was stabbed to death by the escapee's accomplice. The Oregon Court of Appeals found that a special relationship existed between the matron of the detention center and the inmate who escaped, thus bringing the case within section 315(a). The court also found that a special relation existed between the matron and the deceased police officer, thus bringing the case under section 315(b). The court said:

"By undertaking to oversee incarcerated individuals whose escape would pose a danger to others, the defendant assumes a responsibility which places her in a special relationship with those persons who may be harmed by negligent performance of her duties. Whether that class includes the entire general public, we need not decide; it would include police officers who suffer a special danger in relation to escapees." 36 Or. App. at 541.

The cause of action was allowed against the jail matron and, through respondeat superior, the county. The case then went to the Oregon Supreme Court, *Christensen v. Epley*, 287 Or. 539, 601 P.2d 1216 (1979). There, the judgment of the Oregon Court of Appeals was affirmed in part and reversed in part by an equally divided Supreme Court, with one justice abstaining. The disagreement centered primarily on legal issues arising from the one fact that most distinguishes *Christensen* from the instant case: Officer Christensen was stabbed by the escapee's accomplice, who was not an inmate. There had been no custodial

relationship between the killer—the accomplice—and the detention center or the matron therein. Because the court was equally divided, the decision of the Court of Appeals finding that a cause of action was stated was affirmed, and the matter was remanded to the trial court for further proceedings.

The trial court again granted summary judgment, the second time on the ground that Oregon had adopted the "fireman's rule," which bars recovery by firemen and police officers, who are injured in the course of their duties, from one whose negligence caused the injury, unless the danger that caused the injury was an unusual, serious, hidden danger of a totally unexpected kind. The trial court's grant of summary judgment was affirmed by the Oregon Court of Appeals *sub nom., Christensen v. Murphy,* 57 Or. App. 330, 644 P.2d 627 (1982). We are advised that the matter is again on appeal to the Oregon Supreme Court, but we find no record of its final disposition. At any rate, since Kansas does not recognize the "fireman's rule," we need not pursue the ultimate determination of that issue.

In *Maroon v. State, Dept. of Mental Health,* ___ Ind. App. ___, 411 N.E.2d 404 (1980), the parents and legal guardian of an Illinois minor who was kidnapped and killed in Illinois by an escapee from the maximum security division of an Indiana hospital—where he had been serving a twenty-one-year term—brought a negligence action against the State of Indiana and its Department of Mental Health and Department of Corrections. The trial court entered an interlocutory order of dismissal. The Indiana Court of Appeals reversed, holding that the State of Indiana owed the deceased the duty to exercise reasonable care in its custody and control of a "criminal sexual deviant."

Pertinent portions of the opinion of the Indiana Court of Appeals, discussing the existence of a duty under Illinois substantive law, are as follows:

" 'A duty to protect one against the criminal attacks of third persons exists only where the actor, whose negligent conduct creates the risk, is under a special responsibility toward the one who causes the harm, or where a special relationship exists between the negligent actor and the person suffering the harm. ([Citations omitted.] Section 315, Restatement [Second] of Torts.) The special relationships between the actor and the person causing the harm giving rise to such a duty include that of a parent-child, a master-servant, a possessor of land-licensee, and a person taking charge of persons having dangerous propensities. (Sections 316-319, Restatement (Second) of Torts.)' [Quoting from Cross v.

*Chicago Housing Authority,* 74 Ill. App. 3d 921, 30 Ill. Dec. 544, 393 N.E.2d 580 (1979).] (Emphasis added.)

"Especially relevant to the duty issue in this case are two of the sections of the Restatement (Second) of Torts (1965) cited by the *Cross* court: [Sections 315 and 319 are here omitted.]

"That Illinois would recognize this claim in tort against the State of Indiana is further indicated by the fact that Illinois recognizes such claims against itself. Except as provided by its legislature, Illinois ended its sovereign immunity by constitutional amendment in 1972, Illinois Constitution, Article 13, Section 4, and established the Illinois Court of Claims with exclusive jurisdiction over, *inter alia,* all claims against the State for damages in cases sounding in tort. S.H.A. ch. 37, § 439.8 (Supp. 1980).

"Numerous cases dealing with escapees from Illinois state institutions who caused personal injuries and property damage to claimants are reported in the Illinois Court of Claims Reporter, establishing the following Illinois law: The State is under a duty to exercise reasonable care in restraining and controlling dangerous persons committed to its custody so that they will not have the opportunity to inflict foreseeable injury upon others. *Callbeck v. State of Illinois,* (1958) 22 C.C.R. 722. This is the same duty as would apply to a private person or private institution caring for a mentally ill person. *Dever v. State of Illinois,* (1974) 29 C.C.R. 374. The doctrine of res ipsa loquitur applies so that it is incumbent upon the State to come forward with evidence to show it was not negligent; without such showing, negligence is presumed, based on inferences to be drawn from the fact of escape. *Castoro v. State of Illinois,* (1969) 26 C.C.R. 468. The hospital staff is charged with constructive knowledge of a patient's behavioral history. *Dever, supra.* A finding of negligence does not require a finding that the specific act committed could have been foreseen. *Goldring v. State of Illinois,* (1971) 27 C.C.R. 165. *See also Stevenson Auto and Electrical School v. State of Illinois,* (1969) 27 C.C.R. 20, and *Smith v. State of Illinois,* (1974) 30 C.C.R. 167 (two additional cases dealing with escapees from state mental hospitals)." 411 N.E.2d at 414-15.

The case of *Ryan v. State,* 134 Ariz. 308, 656 P.2d 597 (1982), involved a suit against the State, the director of its Department of Corrections and the director of its youth center, brought by the victim of an armed robbery. The plaintiff was shot at point-blank range with a sawed-off shotgun by a seventeen-year-old escapee from an Arizona youth detention center. The Arizona Supreme Court, in overruling one of its earlier cases, *Massengill v. Yuma County,* 104 Ariz. 518, 456 P.2d 376 (1969), and in reversing the trial court, abandoned its prior ruling requiring a determination of whether the tortfeasor has a general or specific duty. The court said:

"We shall no longer engage in the speculative exercise of determining whether the tort-feasor has a general duty to the injured party, which spells no recovery, or if he had a specific individual duty which means recovery. *See Oleszczuk v. State,* 124 Ariz. 373, 604 P.2d 637 (1979); *State v. Superior Court of Maricopa*

*County,* 123 Ariz. 324, 599 P.2d 777 (1979); *Grimm v. Arizona Bd. of Pardons & Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977); *Cady v. State,* 129 Ariz. 258, 630 P.2d 554 (App. 1981); *McGeorge v. City of Phoenix,* 117 Ariz. 272, 572 P.2d 100 (App. 1977). Thus, the parameters of duty owed by the state will ordinarily be coextensive with those owed by others. In this case, for instance, it appears that the existence of duty is dependent upon the application of the provisions of Restatement of Torts § 319." 134 Ariz. at 310.

The thrust of this statement is consistent with the prefatory language of the Kansas Tort Claims Act, K.S.A. 1981 Supp. 75-6103, quoted earlier in this opinion.

Another case in point, and factually somewhat similar to the case at hand, is *Webb v. State of Louisiana,* 91 So. 2d 156 (La. App. 1956). A prisoner, Escobar, escaped from Louisiana State Penitentiary at Angola and fled unseen into the nearby timber. The next morning, while still in the process of attempting to make good his escape, Escobar entered the Webb home and fired two shots from a revolver stolen from an Angola state prison employee. One of the shots struck the plaintiff in the stomach. She brought a negligence action against the State for damages sustained. The trial court found that the prison authorities were negligent in supervising and checking Escobar, and in leaving guns, alcoholic beverages and drugs where they were available to the prisoners. Escobar had a number of prior convictions for violent crimes and was a dangerous prisoner. The trial court held that injuries of the type sustained by Mrs. Webb were foreseeable. Accordingly, the trial court entered judgment for the plaintiff. The Court of Appeal of Louisiana affirmed, saying in part:

"A reading of the record reveals that the factual findings of the trial judge are amply substantiated. Furthermore, we think that under the circumstances the officials and employees were undoubtedly negligent in many respects and that their negligence was a direct and proximate cause of the injuries complained of. . . .

". . . In the case at bar . . . we do believe, as did the trial judge, that the inflicting of wounds on others in the course of escape by a convict through the use of a pistol made available by the negligence of State employees to be a most probable and reasonable foreseeable consequence of the original act or acts of negligence." 91 So. 2d at 163.

It is interesting to note that on the same day *Webb* was decided, the same panel of the Louisiana Court of Appeal decided *Green v. State,* 91 So. 2d 153 (La. App. 1956), *writ denied* 1957. In the latter case, Renaldson, following his escape from a

Louisiana state industrial home, stole an automobile which he negligently drove into the plaintiffs, causing injuries. The court held that the negligent acts or omissions permitting the escape were not the direct, efficient and proximate cause of plaintiffs' injuries, and that the theft and negligent driving were remote and intervening causes. Whether in Kansas the theft of an automobile, followed by high speed and negligent driving, by a serious offender in making his escape is reasonably to be anticipated, we leave for determination in an appropriate case.

See also Annot., Liability of Public Officer or Body for Harm Done by Prisoner Permitted to Escape, 44 A.L.R.3d 899. A review of the cases collected there shows that, when not barred by specific immunity statutes, recovery has generally been allowed in cases where there was a custodial relationship between the escaped prisoner and the State and the harm suffered by the victim was foreseeable.

Cases in which recovery has been sought for injury caused by escaped mental patients are also relevant here. These cases include *Rum River Lumber Co. v. State*, 282 N.W.2d 882 (Minn. 1979) (lumber yard fire set by violent escaped mental patient with known violent tendencies; recovery allowed); *Hilscher v. State of N.Y.*, 64 Misc. 2d 368, 314 N.Y.S.2d 904 (1970) (State held liable for second fire set by inmate who had "eloped" from a state school for mental defectives, but State absolved of responsibility for earlier fire set by same inmate because at that time school authorities had no knowledge of inmate's dangerous proclivity); and *Excelsior Ins. Co. of N.Y. v. State of New York*, 296 N.Y. 40, 69 N.E.2d 553 (1946) (State not held responsible for fire accidentally caused by inmate who had "eloped" from state school for mental defectives where State had no prior knowledge that inmate was dangerous; State is to be held responsible only as to risks reasonably to be perceived.)

We adopt the rule set forth in Restatement (Second) of Torts § 319 (1965) as the law of this state governing the duty of those in charge of persons having dangerous propensities. In the case before us, it can hardly be argued that the State did not have a duty to confine, and confine securely, the seven escapees, all of whom are alleged to have been serving life terms after conviction for murder in various degrees. Their dangerous propensities, especially when they were heavily armed, are obvious.

The duty of the State to exercise reasonable care is, of course, commensurate with the risk. The risk of harm created by a convicted forger serving a two-year term who walks away from a work camp is minimal compared with the risk of harm created by convicted murderers serving life terms who escape from the confines of a maximum security prison. Add to that picture that the latter are heavily armed with weapons taken from the penitentiary, and the prospects for immediate harm, personal injury, or death to nearby residents or peace officers increase spectacularly.

The State also had a duty, in this day of modern communication, to notify area residents by some prearranged signal—siren, bell, whistle, prompt news release to local media, or some other method—as soon as a major escape such as this was known to prison officials. It further had a duty to notify area law enforcement officials promptly through the usual police communication channels. These would include telephone, radio, teletype or computer communications to surrounding law enforcement agencies. Radio dispatchers for those various agencies could then notify the officers on duty immediately. We conclude that Cansler has adequately alleged a duty on the part of the State, a breach thereof, and a causal connection between the breach of that duty and the injuries and damages sustained.

## II. THE COUNTY'S DUTY

The second issue is whether Leavenworth County, through the county sheriff and the sheriff's department, owed the plaintiff a duty to warn him of the escape, and whether that duty was breached. Since the seven escapees did not escape from the Leavenworth County jail or from its officers, the county would have no duty under the rationale set forth above. Plaintiff, however, alleges that:

"[B]y reason of certain agreements between all of the defendants and between the defendants and other law enforcement agencies and by virtue of the defendants' previous course of conduct, there existed a 'special relationship' between . . . Leavenworth County . . . and the plaintiff, which imposed upon the [defendant county] . . . a duty to warn the plaintiff of the hazard posed by the seven armed escaped convicts . . . ."

In support of this contention, plaintiff cites the K.B.I. report of the escape, which states that the Leavenworth County sheriff's office was notified by the penitentiary of the escape at 8:55 a.m. and concludes:

"Apparently it is KSP's policy to only notify LVSO of an escape . . . and through *planned policy or agreement* LVSO then makes the necessary radio broadcast and/or notification of other law enforcement agencies." (Emphasis supplied.)

The plaintiff also claims that the Leavenworth County sheriff's department was a member of the "Operation Roadblock Signal 500" plan and that the sheriff's office failed to institute or activate that plan upon being notified of the escape. The portions of the roadblock plan included within the record provide the machinery for the setting up of roadblocks in the case of escapes. One part of the plan states that:

"The dispatcher of the radio system covering the crime scene shall be the dispatcher responsible for relaying the information to the other agencies."

Roadblock points are designated throughout Leavenworth and Wyandotte Counties, and several other areas not here involved. The agencies for the roadblocks include, among others, the Leavenworth and Wyandotte County sheriff's offices and the Bonner Springs police department.

In short, plaintiff has claimed that the County's duty to warn him arose from voluntary assumption of a duty. Prosser, Law of Torts § 56, p. 344 (4th ed. 1971), observes:

"This idea of voluntary assumption of a duty by affirmative conduct runs through a variety of cases."

Thus, if plaintiff can establish that the Leavenworth County sheriff's office has repeatedly, over a period of time, notified surrounding law enforcement agencies when an escape takes place at the Kansas State Penitentiary, or if plaintiff can establish that the sheriff's office has agreed to do so, a duty or obligation on the part of the County may be established.

Restatement (Second) of Torts § 324A (1965) reads as follows:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
    (a) his failure to exercise reasonable care increases the risk of such harm, or
    (b) he has undertaken to perform a duty owed by the other to the third person, or
    (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

We adopted that section in *Schmeck v. City of Shawnee*, 232

Kan. 11, 651 P.2d 585 (1982). In Syllabus ¶ 4 of that opinion we said:

"One who undertakes to render services to another which he should recognize as necessary for the protection of a third person is liable to the third person for harm resulting from his failure to exercise reasonable care. Restatement (Second) of Torts § 324A (1965)."

See also *Ingram v. Howard-Needles-Tammen & Bergendoff,* 234 Kan. 289, 672 P.2d 1083 (1983). Section 324A sets forth a sound rule. If the Leavenworth County sheriff's office has agreed with the penitentiary, or with other agencies through the Operation Roadblock plan, that it will warn other law enforcement agencies of escapes, or if it has repeatedly done so, then Leavenworth County may be liable to third persons such as the plaintiff for harm resulting from the failure of its officers to exercise reasonable care in disseminating the information promptly.

We do not know, and the record does not disclose, the full nature of any agreement between the penitentiary and the Leavenworth County sheriff's office, nor does the evidence disclose past practice in regard to dissemination of escape information. Further, the complete copy of the Operation Roadblock Signal 500 plan, its signatories, the commitments it contains, and whether such an agreement was in full force and effect at the time of the incident herein, are matters not fully disclosed by the record. We conclude, however, that plaintiff has sufficiently alleged a claim against the county for breach of a duty of care arising from a contract and resulting in injury to state a claim under the theories discussed above. We therefore conclude that the trial court erred in dismissing plaintiff's claim as against Leavenworth County.

## III. THE ENFORCEMENT OF A LAW EXCEPTION

The State claims that it is exempt from liability by virtue of the enforcement or nonenforcement of a law exception to the Tort Claims Act, K.S.A. 1981 Supp. 75-6104(c), which reads:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

"(c) enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, regulation, ordinance or resolution . . . ."

The State cites several statutes which require it to retain

custody of inmates at the State's several penal institutions. These include K.S.A. 75-5201 *et seq.,* creating the Department of Corrections; K.S.A. 21-4603, defining the authorized dispositions a court may make after a criminal conviction, including committing the defendant to the custody of the secretary of corrections; K.S.A. 21-4620, which authorizes the sentencing of defendants to the custody of the secretary of corrections; and K.S.A. 21-4621, which provides for a commitment order, committing the defendant to the custody of the secretary of corrections. The State then argues that when the escape occurred, it was enforcing or attempting to enforce those laws.

True, the statutes not only authorize the State, through the secretary of corrections, to assume and maintain custody of inmates in the State's penal institutions, including the Kansas State Penitentiary at Lansing, Kansas, but they also impose a duty upon the secretary to retain custody. But state agencies all are created by law; their powers and their duties are established by law; and, in one sense or another, they carry out or enforce the law when they proceed with their day-to-day operations. If 75-6104(c) is given the broadest possible construction, then it becomes almost impossible to conceive of an action by a governmental agency which does not constitute enforcing or carrying out a law.

We construe K.S.A. 1981 Supp. 75-6104(c) to provide an exemption from claimed liability only where claimant's sole asserted claim of causal negligence is the public entity's enforcement or failure to enforce a law. That section does not provide an exemption where the agency, in enforcing or failing to enforce a law, commits some additional tortious act or omission which would be negligence at common law, and which act or omission causes damage.

The primary case in which we have considered the applicability of this subsection is *Lantz v. City of Lawrence,* 232 Kan. 492, 657 P.2d 539 (1983), a case involving the acts of city employees purportedly acting under a city weed ordinance. In Syllabus ¶ 2, we said:

"The exception in the Kansas Tort Claims Act contained in K.S.A. 1981 Supp. 75-6104(c), exempting governmental entities from liability where damage results from the enforcement of a law, is inapplicable where it is determined by a trier of fact that the actions of city employees giving rise to the lawsuit were outside the

purview of the municipal ordinance which allegedly granted authority for such action."

In *Lantz*, city employees went to the plaintiffs' land to cut weeds. Allegedly, they used not only mowers, sickles, scythes or other implements customarily used in cutting grass or weeds, but they also used chain saws; and plaintiffs claimed that the city employees cut down sixty-three hackberry, elm, walnut, ash and oak trees of varying sizes. We held that, when all reasonable inferences were drawn from the plaintiffs' statement of facts, a material issue of fact emerged concerning whether the city employees' actions were within the purview of the city's weed abatement ordinance authorizing the removal of "weeds." If the actions were without the ordinance, then liability could follow.

Here, the claim is not based upon the State's simple acts of retaining or failing to retain custody of the inmates; the claim is based upon the State's failing in its common law duty to retain custody of known dangerous persons, in giving them access to highpowered firearms, in permitting them to escape confinement while well armed, and in failing to warn the public and nearby on-duty law enforcement personnel, including the plaintiff, of the escape. The duty to warn, for example, is not imposed by statute. We conclude that K.S.A. 1981 Supp. 75-6104(c) does not exempt the State from liability under the alleged facts of this case. The claim against the County is based upon breach of duty arising under contract or arising from a long-standing course of conduct, and the statute likewise affords no protection to the County from that claim.

IV. THE DISCRETIONARY FUNCTION EXCEPTION

The fourth point to be considered is whether K.S.A. 1981 Supp. 75-6104(d), the discretionary function exception, is applicable to the claims against either defendant. That portion of the statute reads:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

(d) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion be abused . . . ."

We have previously discussed this exemption in *Carpenter v. Johnson*, 231 Kan. 783, 788-89, 649 P.2d 400 (1982), and *Robertson v. City of Topeka*, 231 Kan. 358, 362, 644 P.2d 458 (1982).

See also Note, *Governmental Liability: The Kansas Tort Claims Act [or The King Can Do Wrong]*, 19 Washburn L.J. 260 (1980), and Palmer, *A Practitioner's Guide to the Kansas Tort Claims Act*, 48 J.K.B.A. 299 (1979). An extended discussion is not warranted here, however, since plaintiff's claim is not based upon abuse of discretion, but upon breach of a nondiscretionary duty.

The State has a duty to exercise reasonable care to keep prisoners in custody according to the terms of their respective sentences. Inherent in the duty to confine is a duty to establish adequate procedures and safeguards to prevent escapes and to discover and report escapes promptly when they do occur, to employ competent guards and staff and give them proper instruction, and to have and to maintain proper equipment. The State, as the custodian of dangerous persons, has a duty to warn when dangerous inmates escape. Plaintiff claims the State breached its duty to confine and its duty to warn, and that such breach caused plaintiff's injuries and damages. The duty to confine and the duty to warn are imposed by law and are ministerial, not discretionary. Plaintiff does not claim, for example, that the State abused its discretion in allowing too many inmates to be in the exercise yard at one time, or in not assigning sufficient guards to tower duty, or in using a bell to warn of the escape instead of a siren or horn. His claim is not based upon *how* the State decided to confine or warn, but upon the State's alleged complete failure to do so. Whether the State exercised reasonable care is an issue of fact.

As to the County, plaintiff claims that the County entered into an agreement to notify nearby law enforcement agencies in the event of escapes from the penitentiary, or by a course of conduct voluntarily assumed that function. If plaintiff can prove either agreement or course of conduct, then the County's resulting duty was not discretionary; the County was under an obligation to give reasonable notice to other law enforcement agencies, and those agencies and their employees had a right to depend upon such notification.

The discretionary function exemption provides no barrier to plaintiff's claims against either defendant, both of whose acts or omissions were not discretionary, under the alleged facts now before us. The alleged acts or omissions complained of were ministerial, not discretionary. See *Cook v. City of Topeka*, 232 Kan. 334, 654 P.2d 953 (1982).

## V. THE POLICE PROTECTION EXEMPTION

Both the State and the County contend that they are exempt from liability by virtue of the police protection exemption of the Tort Claims Act, K.S.A. 1981 Supp. 75-6104(*m*), which provides:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

(*m*) failure to provide, or the method of providing, police or fire protection . . . ."

The State claims that it is providing "police protection" when it operates a prison. It cites K.S.A. 1981 Supp. 75-5247a, which provides in part:

"75-5247a. . . . The director of any correctional institution within the Kansas Department of Corrections, all deputy directors, all persons on the staff of the department of corrections who are in the chain of command from the secretary of corrections to the correctional officer and every correctional officer, regardless of rank, while acting within the scope of their duties as employees of the department of corrections, shall possess such powers and duties of a law enforcement officer as are necessary for the performance of such duties and may exercise such powers and duties anywhere within the state of Kansas."

It also cites K.S.A. 22-2202(11), which provides:

" 'Law enforcement officer' means any person who by virtue of office or public employment is vested by law with a duty to maintain public order or to make arrests . . . and includes . . . wardens, superintendents, directors, security personnel, and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of crime, while acting within the scope of their authority."

There is no question that penal officials and employees have the powers of law enforcement officers when such powers are necessary for the performance of their duties. When moving prisoners from one penal institution to another, or to and from court, penal officers would have and exercise the same powers as would, for example, a deputy sheriff. The operation of a penal institution is carried on pursuant to the police power of the state, and the institution itself provides police protection for all Kansas residents by keeping apart from the rest of the population those convicted felony offenders whose actions have been and perhaps promise to be dangerous and inimical to society. Both public and private mental hospitals may also serve the same function of protecting society from dangerous people. All such institutions,

as we have seen, have a common law duty to issue a timely warning when extremely dangerous people escape from custody.

The duty to warn, under the facts of this case, is not solely a law enforcement or police protection function; it is a common law duty imposed upon all who take charge of persons extremely dangerous to others, as more fully discussed above and as more explicitly stated in Restatement (Second) of Torts § 319 (1965). While the seven inmates were within the walls of the penitentiary, the State's duty could be classified as custodial and as providing police protection for the benefit of all Kansans. Once the inmates had escaped, however, then in addition to the duty to recapture the escapees, the State had a duty to warn. This duty to disseminate information did not constitute a duty to provide police protection. It could be performed by anyone in the State's employ who could use a telephone, send a message, or push a button to sound an alarm. We do not think the legislature intended "police protection" to be so broadly construed as is urged by defendants.

We therefore hold that failing to warn does not constitute failing to provide "police protection," and that the State is not exempt, under K.S.A. 1981 Supp. 75-6104(*m*), from the plaintiff's claim, under the facts here asserted.

As to the County, plaintiff's claim is based upon breach of a duty imposed by contract, or breach of a duty established by a repeated course of conduct. It is not based upon the County's breach of any statutory duty, or its duty to provide "police protection." Once the County assumed the duty to warn, it became obligated to exercise reasonable care in doing so. Whether the County assumed the duty to warn either by contract or by a course of conduct, and whether its actions in feeding a message into a broken computer and in notifying only police officers in the immediate locale (together with whatever action it took which may later be disclosed by the evidence) constitute the exercise of reasonable care, are fact issues which we do not now decide. What we do hold is that the County is not exempt from liability by virtue of K.S.A. 1981 Supp. 75-6104(*m*) under the alleged facts of this case.

VI. <u>OTHER ISSUES</u>

In its motion to dismiss, the County claimed that it was not liable to the plaintiff because he was covered by workers' com-

pensation. Cansler, of course, was employed by the City of Bonner Springs, Kansas. Leavenworth County was not his employer and did not provide workers' compensation coverage for him. The fact that the City provided such protection for its employee is of no concern to the County and is not a defense available to it. The act provides an exclusive remedy for an employee against the employer, but it does not bar an action by the employee against third parties. See K.S.A. 44-501 and cases cited thereunder.

Finally, in its motion to dismiss, the County contends that venue is improper. The trial court did not rule on this issue, and we therefore do not reach the merits of this claim. Suffice it to say that if improper venue were found, such finding would not result in dismissal of the action, but merely transfer. See K.S.A. 60-611.

The order of the trial court reinstating plaintiff's claim against the State of Kansas and the Kansas State Penitentiary is affirmed, and the order of the trial court dismissing plaintiff's claim against the Sheriff of Leavenworth County, the Leavenworth County Sheriff's Department, and the Board of County Commissioners of Leavenworth County, Kansas, is reversed. The case is remanded for further proceedings consistent with this opinion.

SCHROEDER, C.J., concurs in the result.