No. 62,189

Gregg and Pamela K. Collins, *Appellants*, v. Heavener Prop-
erties, Inc., a Kansas Corporation, and Jack Heavener, *De-
fendants*, and Sedgwick County Board of County Com-
missioners, *Appellee*.

(783 P.2d 883)

Opinion filed
December 8, 1989.

*Harold T. Pickler*, of Peggs & Pickler, of Wichita, argued the cause, and
*Jack Peggs*, of the same firm, was with him on the brief for appellants.

*Michael D. Pepoon*, assistant county counselor, argued the cause, and
*Henry H. Blase*, county counselor, was with him on the brief for appellee.

The opinion of the court was delivered by

Allegrucci, J.: This is an action by the plaintiffs Gregg and
Pamela Collins against defendants Jack Heavener and the Sedg-
wick County Board of County Commissioners (Board) for damages
resulting from the installation of a septic system. In their cause
of action against the Board, plaintiffs alleged the Board negligently
granted the permit to install the septic system. The district court
granted the Board's motion for directed verdict, based upon the
exemption under the Kansas Tort Claims Act relating to inspec-
tions. Although amendments to the Tort Claims Act now cause
this exemption to appear at K.S.A. 1988 Supp. 75-6104(k) rather
than (j), this exemption was not changed from the original as
enacted. The plaintiffs appeal.

The facts are not disputed. In the summer of 1985, Pam and
Gregg Collins sought an acre lot on which to build a house. They
found and made an offer on lot Reserve B in Heavener's Addition
near Derby, Kansas. The contract, which was executed on the

28th of August, 1985, between the Collinses and the seller, Jack Heavener, contained an express provision inserted by the realtor that the lot would have water and that "the soil would perk test for a septic system." Previously, the Collinses had built a house requiring a large septic system. Due to the cost of that system, the contract provision that the soil would perk test for a septic system was important to them because the area had no municipal sewer.

On September 9, 1985, Jack Heavener obtained a permit for installation of a sewage system upon Reserve B by applying for a variance of sewage facility standards. The variance required that the lateral trench be a minimum of 30 inches deep and a maximum of 4.5 feet, that 1,000 feet of lateral trenches be installed, and that a 1,000-gallon holding tank be used. This variance was permissible under a resolution adopted by the Board.

Soon after the contract was executed, the Collinses were told that Jack Heavener had completed the required percolation test and obtained the permit to construct a septic system. After the closing on September 15, 1985, Pamela Collins obtained a building permit for construction of the house. When the septic system was installed in January 1986, the Collinses first saw the permit, which required 1,000 feet of laterals—twice the size of the system they had anticipated. Roy Cromer, a water quality supervisor for the health department, agreed to reduce the laterals to 750 feet, but cautioned the Collinses that additional laterals might be necessary. Reducing the footage of the laterals took away the safety factor in the construction of the sewage system.

The Collinses moved into their new home on May 18, 1986. The toilet in the master bedroom overflowed on August 8, 1986. The 1,000-gallon septic tank was full; two 1,500-gallon loads were pumped from the tank during the next two days. When the system backed up again on August 18, 1986, 300 additional feet of laterals were added to the original 750 feet. Approximately 10 days after the additional laterals were added, the system backed up again. When the Collinses called Jack Heavener, he told them the system was installed too deep. He offered to pay for certain corrective measures if the Collinses would drop their complaints. He did not mention any restrictions on Reserve B.

At this point, the Collinses obtained copies of all records pertaining to Reserve B, Heavener's First Addition. They discovered that the records from the county health department contained percolation tests in 1977 and 1978, when the area was first platted. They also discovered that, on September 5, 1978, based upon the results of those tests, the health department classified the lot Reserve B, then designated as Lot 14, as "unsuitable for septic systems and must remain undeveloped." The letter from the Sedgwick County Health Department to the Derby City Planning Commission stated: "The developer should submit to this office and the Derby Planning Commission an acceptable method for clearly designating in public records the status of these lots." This letter further provided:

"The unsuitable lots may be labeled 'Reserves' on the plat, noted unbuildable in the plat text or simply not included in the platted area of the subdivision. Restrictive covenants prohibiting building on the lots would be acceptable. The use of any method would incorporate an automatic release on the lots at such time as a public sewer is available for connection."

A three-by-five index card at the health department contained information concerning the issuance of septic system permits on various lots in Heavener's First Addition. Concerning Reserve B, this card originally contained the notation "no permit," but the notation was scratched through and altered to indicate a 60 to 90 percolation rate. Testimony by officials of the health department could not explain why the notation was changed, who changed it, or when the change occurred; no mention was made of any restrictions on or problems with lot Reserve B when the permit was obtained.

The percolation rate is the ability of the soil to absorb or transmit water. Before plats or subdivisions of land are approved, the suitability of soil for private disposal sewage systems must be determined by the health officer, based upon the results of soil percolation tests. The code mandates, in part:

"If a lateral field is utilized, at least 10,000 square feet of the property must be suitable for the location of the lateral field and must meet the following conditions:
   a. Soil percolation tests for the lateral field area shall indicate a soil porosity at saturation such that a one-inch absorption or greater occurs within sixty minutes."

The code requires a percolation rate of 60. The percolation rate for any given soil sample is designated by a numeral equal to the number of minutes required for the absorption of one inch of water. The higher the numeral, the less the soil's porosity.

All of the percolation rate data filed with the health department at the time a septic system permit was issued here indicated a percolation rate in excess of 90. The correspondence in the health department file and the index card showed that the soil porosity was such that laterals of at least 1,000 feet and perhaps more were necessary for this site.

At the close of the plaintiffs' case, defendant Board moved for a directed verdict, arguing that it was exempt from liability under the Kansas Tort Claims Act because the conduct that occurred here was a failure to adequately inspect the situation as anticipated by K.S.A. 1988 Supp. 75-6104(k). In support of its argument, defendant directed the trial court to this court's decision in *Siple v. City of Topeka*, 235 Kan. 167, 679 P.2d 190 (1984). The trial court concluded that plaintiffs had established a prima facie case of negligence against the Board with no justification for issuing a permit after repeated statements that the land did not qualify for issuance of a permit to install a septic system. The court concluded, however, that the action of the county in determining whether the property met certain standards amounted to an inspection, which fell under the exemption of the Kansas Tort Claims Act relating to inspections by governmental entities, contained at K.S.A. 1988 Supp. 75-6104(k).

After the county was dismissed from the case, the trial to the court continued, resulting in a verdict against defendant Heavener. Plaintiffs were awarded compensatory damages of $15,568.61 and punitive damages of $100,000 in addition to attorney fees totalling $6,400 and the costs of the action.

The issue on appeal is whether the defendant Board is exempt from liability pursuant to K.S.A. 1988 Supp. 75-6104. Plaintiffs brought this action against the Board based upon the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.*, which provides, in part:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment

under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 75-6103(a).

The Board responded that it was exempt from liability under the Kansas Tort Claims Act for failing to make or in making an inadequate inspection as provided for in K.S.A. 1988 Supp. 75-6104(k), which provides:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
. . . .
"(k) the failure to make an inspection, or making an inadequate or negligent inspection, of any property other than the property of the governmental entity, to determine whether the property complies with or violates any law or regulation or contains a hazard to public health or safety."

The trial court found that this exemption was applicable based upon its interpretation of our decision in *Siple*.

Plaintiffs argue that the trial court incorrectly interpreted *Siple* by applying this exemption to ministerial functions of county officials rather than limiting it to inspections by county officials. Here, the county was not involved in the actual inspection through the performance of percolation tests. Instead, county officials merely had to apply the results of these tests to the controlling standards. Thus, the negligent conduct was not the inspection but the application of inspection data obtained by a third party. According to plaintiffs' argument, this negligence is not exempt because it involved only the mechanical and ministerial application of written guidelines that the county officials were required to follow. This ministerial act is separate from the inspection and can be done days, months, or years after the inspection.

In *Siple v. City of Topeka*, plaintiffs sued the city for its failure to remove an allegedly defective tree. Plaintiffs and other neighbors had complained to the city forestry department a number of times that the tree was dangerous and that limbs were falling. The city forester inspected the tree visually, observing several rotted areas on the tree trunk. The tree was not removed before a storm on June 21, 1981, during which a tree limb broke and fell on plaintiffs' car, completely demolishing it. The tree was removed in 1982 at the request of the property owner. During

trial, an expert witness testified that a visual inspection of the tree was insufficient under the circumstances.

The trial court found for the plaintiffs and awarded damages. The City of Topeka appealed, arguing that, although the city forester had the duty to inspect trees and determine if a tree or trees endangered the public safety, the city employee's inspection, lack of inspection, or negligent inspection was specifically exempted from liability under K.S.A. 1988 Supp. 75-6104(k). In finding that this exemption applied, this court reviewed the doctrine of governmental immunity, noting as follows:

"The historical origin of the governmental immunity doctrine has been discussed in many prior cases. The doctrine of governmental immunity was held to exempt governmental entities from privately instituted civil suits without the expressed consent of the sovereign. The doctrine was founded upon the belief the courts, which derived their power from the sovereign, could not have been empowered to enforce such authority against the sovereign; that the king could do no wrong, nor could he authorize such conduct while acting in his sovereign capacity, for no man can do by his agents and officers that which he cannot do by himself. Under the doctrine of immunity for governmental officers, the common law recognized the necessity of permitting public officials to perform their official duties free from the threat of personal liability. *Brown v. Wichita State University*, 217 Kan. 279, 540 P.2d 66 (1975), *modified on reh.* 219 Kan. 2, 547 P.2d 1015 (1976).

"The doctrine of governmental and sovereign immunity, as noted in *Brown*, was originally of judicial origin in Kansas. Unless a state is prohibited by its constitution it may waive its privileges and immunities from suit and permit itself to be made a defendant in a private suit. Consent of the state to be sued upon claims against it or its employees by private persons is generally given expressly by statutory enactment. The State, as the creator of municipal corporations, may by statute impose obligations or liabilities upon the municipal corporation which otherwise would not exist unless such action is prohibited by the State Constitution." 235 Kan. at 169-70.

Enactment of the Kansas Tort Claims Act by the Kansas Legislature permitted recovery of damages from a governmental entity unless the conduct came within one of the exemptions. In reviewing the exemption relating to inspections, this court in *Siple* noted:

"Inspection laws are regulations designed to safeguard the public against fraud, injury and to promote the public health, safety and welfare. They provide for the examination or inspection of property by an authorized public official. The public official is to examine and determine whether the standards prescribed by the regulations are complied with." 235 Kan. at 170-71.

We also noted the numerous requirements of the Kansas statutes for governmental entities to inspect a variety of situations, not just buildings inspections. Under this exemption, when an employee of a governmental entity conducts an inspection within the course of his employment, neither the governmental entity nor the employee is liable for the failure of the employee to make an inspection or for making an inadequate or negligent inspection. We interpreted the term "inspection" as used in K.S.A. 1988 Supp. 75-6104(k) to mean "investigation, or examination for the purpose of determining whether any property other than property of a governmental entity complies with or violates any law or regulation of the governmental entity or constitutes a hazard to public health or safety." 235 Kan. at 172. Concluding that the conduct by the city regarding the tree was an inspection that came within the exemption, the court noted that statutes, ordinances, and codes requiring inspections are enacted for the benefit of the public at large. By including the exemption relating to inspections, the legislature sought to encourage governmental entities to be involved in inspection activities rather than discourage such inspections by the imposition of civil tort liability. Thus, this court stated: "Inspections under such statutes, ordinances and codes are not a private service to the owner or occupier of the property. Inspection laws do not create a duty to an individual." 235 Kan. at 173. For this reason, the exemption relating to inspections was enacted to preclude an individual from recovering damages caused by a governmental employee acting within the scope of his employment in failing to make or making an inadequate or negligent inspection. 235 Kan. at 174.

Defendant Board urges this court to adopt the analysis used by the California courts in interpreting its inspection immunity provision. This provision, which is found at Cal. Gov't Code § 818.6 (West 1980), grants absolute immunity from liability for any "negligent inspection" of private property to determine if such property constitutes a hazard to health or safety whether or not the duty to inspect is construed as "mandatory" or "discretionary." *Cochran v. Herzog Engraving Co.*, 155 Cal. App. 3d 405, 205 Cal. Rptr. 1 (1984). In *Cochran*, plaintiffs sought damages for a death that occurred when a fire broke out during the

course of decedent's employment involving the use of magnesium, a highly combustible substance. The court refused to give the inspection immunity a narrow interpretation and concluded that the immunity provided by the California statute protected the governmental entity from liability not only for the failure to detect technical safety code violations, but also for any negligence directly connected to the inspection process. For the immunity to apply, the court concluded:

"[T]he negligence in question must have been part and parcel of the inspection or have had a direct or proximate effect on it, either by impairing its value, frustrating its goals or purposes, affecting the results or findings made, or in some other way resulting in damage to the investigation itself." 155 Cal. App. 3d at 412.

The *Cochran* case emphasizes the need for an exemption that will allow the governmental entity to be involved in inspection activities without exposing itself to liability for virtually all property defects within its jurisdiction. While the *Cochran* case is helpful in understanding this need for immunity, defendants' reliance upon its interpretation of the California statutes for guidance in interpreting the Kansas statutes is misplaced. In California, sovereign immunity is the rule and governmental liability is limited to exceptions specifically set forth by statute. *Cochran*, 155 Cal. App. 3d at 409. Conversely, in Kansas, tort liability is the rule and governmental entities are exempt from suit only if an applicable exception is set forth in the statute. *Hopkins v. State*, 237 Kan. 601, 609, 702 P.2d 311 (1985).

As previously noted, inspection as used in the Kansas Tort Claims Act was defined in *Siple v. City of Topeka*, 235 Kan. 167, as an investigation or examination to determine if property complies with or violates any law or regulation or constitutes a hazard to public health or safety. In determining that the city forester's action constituted an inspection, we said:

"The city forester was notified by the Siples and their neighbors of a tree which endangered public safety because tree limbs were falling to the ground. How did the forester determine whether the tree endangered the public safety? The city forester went to the location, visually examined and inspected the tree, determined the tree was not endangering the public safety and took no further action. The forester's inspection was conducted within the scope of his employment. That inspection, found by the trial court to have been done in a negligent manner, did not subject the City

or the forester to a private claim for damages to the Siples' automobile. Such inspection is one of the listed exceptions from liability granted governmental entities or its employee under K.S.A. 1983 Supp. 75-6104 for the employee's acts or omissions." 235 Kan. at 173.

Here, the determining factor in issuing the permit to install a septic system was the percolation rate of the soil. The soil on plaintiffs' lot was tested and, based upon the test results, the health department determined the lot was not suitable for a septic system. All subsequent soil tests upon plaintiffs' lot indicated a percolation rate in excess of 90. At that point in time, the inspection contemplated by 75-6104(k) was completed. Nothing further needed to be done to determine if the plaintiffs' lot complied with the regulation. It did not comply. The permit was subsequently issued based either upon the alteration of the three-by-five index card or by disregarding the test results in contradiction to the county regulation, neither of which is part of the inspection contemplated by 75-6104(k).

The trial court granted the Board's motion to dismiss on the grounds that the Board was immune under the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.* In so doing, the trial court relied on the "inspection" exemption set out in the statute. We find that reliance to be misplaced. Although we agree with the result reached by the trial court, we are of the opinion it was for the wrong reason.

The health department follows rules and regulations of standards for the issuance of septic system permits. Bulletin 4-2, which was issued by the Kansas Department of Health and Environment, is incorporated by reference in the Sedgwick County Health and Sanitation Code No. 5, which was expressly adopted by the Board by resolution in 1975. The resolution charges the health department with the responsibility of enforcing the provisions of the sanitation code. The trial court found: "The record does not disclose why the County ignored a county resolution or a state department bulletin in issuing the permit." The trial judge stated:

"I think the plaintiff in his case has established a prima facie case of negligence. Based on the evidence I have heard, I've heard no justification for issuing a permit after there had been repeated statements that this land did not qualify for a septic system. There had been no information provided

to the County different from those 1982 test results, when that permit was issued."

K.S.A. 1988 Supp. 75-6104(c) provides that a governmental entity is not liable for damages resulting from: "enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, regulation, ordinance or resolution." This subsection was last interpreted in *Barber v. Williams*, 244 Kan. 318, 320, 767 P.2d 1284 (1989). Plaintiff, who gave $53,000 to fortunetellers, argued that, once the City of Topeka undertook the licensing of fortunetellers, the city had a duty to act with due care. If it failed to so act, and loss or injury resulted, then the city was liable. We found that the city's actions in issuing the licenses were within the scope of the ordinance and found no additional tortious act or omission that could be negligence at common law. We said:

"*Jackson* [*v. City of Kansas City*, 235 Kan. 278, 286, 680 P.2d 877 (1984),] is the most recent case on point. There, the City of Kansas City appealed a judgment for damages which was entered against the City following a jury trial. The City contended that the failure of one of its employees to abide by a departmental regulation concerning the operation of emergency vehicles was the equivalent of the failure to enforce an ordinance or regulation, and thus liability was barred by 75-6104(c). We did not agree. Relying on *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), we explained that tortious conduct outside the scope of the regulation or ordinance, which would be negligence at common law, is an actionable tort for which the government is not immune. We quoted from *Cansler*:

" ' "We construed K.S.A. 1981 Supp. 75-6104(c) to provide an exemption from claimed liability only where claimant's sole asserted claim of causal negligence is the public entity's enforcement or failure to enforce a law. That section does not provide an exemption where the agency, in enforcing or failing to enforce a law, *commits some additional tortious act or omission which would be negligence at common law*, and which act or omission causes damage." 234 Kan. at 568.' (Emphasis supplied.) 235 Kan. 285-86.

.  .  .  .

"The plaintiff in the case now before us makes no showing that the actions of the City of Topeka were outside the scope or purview of the ordinance. In accordance with the ordinance, an investigation of the applicant was conducted. Before it issued the license, the City was not aware of the prior infractions or difficulties in which the applicant's mother was involved. It was, however, aware of those before the license was renewed, and could be considered negligent in renewing the license. However, all of the City's actions were within the scope of the ordinance. We discern no 'additional

tortious act or omission which would be negligence at common law.' " 244 Kan. at 321-23.

We also rejected plaintiff's argument that a duty of due care was placed upon the city. We noted that the Kansas Legislature, in enacting subsection (c), did not adopt the exact language of the federal tort claims act that specifically requires a government employee to act "with due care." We concluded that the legislature intentionally omitted the "with due care" language found in the federal statute, making the exception to the Kansas Tort Claims Act broader than its federal counterpart.

Here, an investigation was conducted which indicated a permit should not be issued under the county regulation. Although the Board was negligent in issuing the permit, its actions were within the scope of the regulation. There was no additional act or omission which would be negligence at common law. We find the *Barber* rationale applicable in the present case and our decision in *Barber* to be controlling here. We therefore conclude that defendant Board is exempt from liability under K.S.A. 1988 Supp. 75-6104(c). Where the district court's decision is correct, albeit for the wrong reason, it will be upheld. *Sutter Bros. Constr. Co. v. City of Leavenworth*, 238 Kan. 85, 93, 708 P.2d 190 (1985). The judgment of the district court must, accordingly, be affirmed.

The judgment is affirmed.

SIX, J., not participating.