NOT DESIGNATED FOR PUBLICATION

No. 113,055

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BREANN DREW and ZANE DREW,
by and through their Father,
Natural Guardian, and Next Friend
RUSS DREW, *et al.*,
*Appellees*,

v.

STATE OF KANSAS,
*Appellant.*


MEMORANDUM OPINION


Appeal from Wyandotte District Court; R. WAYNE LAMPSON, judge. Opinion filed October 7, 2016. Affirmed.


*Bryan C. Clark*, assistant solicitor general, and *M.J. Willoughby*, assistant attorney general, for appellant.


*Roger W. McLean*, of Roger W. McLean, P.A., of Kansas City, for appellees.


Before LEBEN, P.J., STANDRIDGE and ARNOLD-BURGER, JJ.


LEBEN, J.: Like many cases that come through the court system, this one arises out of tragedy. A woman injured in a head-on car crash died when emergency-medical personnel decided not to send her to the closest available trauma center—in Kansas— even though she was critically injured and the most in need of immediate care among the four people injured in the collision. A jury concluded that the decision instead to send her to a Missouri hospital, further away, was influenced by Kansas Highway Patrol troopers

who wanted to keep the driver and passenger of the car that caused the collision in Kansas; the jury specifically concluded that the troopers acted negligently when they interfered with what should have been a medically based decision. The result of the jury trial was a $120,000 judgment against the State of Kansas, which is responsible for the troopers' conduct.

The State has appealed on several grounds, including that the woman's family didn't have a proper legal claim against the State, that the troopers' conduct wasn't the legal cause of the woman's death, that a $500,000 cap on negligence damages against government entities had already been met through a settlement on behalf of the emergency-medical personnel, and that a new trial should be ordered either because the legal instructions to the jury were flawed or because the district judge originally assigned to the case had a serious conflict of interest. We have carefully reviewed each of the State's claims, as we will explain in this opinion, but we do not find any error requiring that we interfere with the jury's verdict. Nor did the district court, so we affirm its judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On an otherwise quiet Sunday afternoon in May 2007, Kansas Highway Patrol Master Trooper Michael Gruber observed a speeding car and began what ordinarily would be a routine traffic stop. But the driver, Charles Barker, sped away, which resulted in a high-speed chase on I-635 and K-32 (Kansas Avenue) in Wyandotte County. The chase ended when Barker drove into traffic coming from the other direction so that he could go around a slow-moving truck on his side of the road. Barker's car ran head-on at high speed into a car driven by Jayson Fenton. Kristin Saragusa was a passenger in Fenton's car.

Everyone in the two cars was injured. Fenton and Saragusa were wearing seat belts, but Saragusa was seriously injured. Fenton was hurt too, but not with life-threatening injuries; he was able to stumble out of the car on his own when Gruber arrived and opened the door. Barker and his passenger, Martez Charles, were not wearing seat belts and were thrown many feet away from their car. Both of Charles' legs were broken.

Kansas City, Kansas, Fire Department and Emergency Medical Services (EMS) personnel responded. We will focus on two of them: Douglas Trowbridge, the EMS supervisor in charge of on-scene medical personnel, and Ray Horvat, the assistant fire chief who acted as the on-scene incident commander. Horvat had ultimate control over fire suppression (Barker's car caught on fire after the crash) and medical care. Trowbridge reported to Horvat.

Trowbridge evaluated each person's injuries. He looked in on Saragusa, by then in an ambulance, as medical personnel were trying to put a breathing tube in. He could tell that she was not breathing well, that she was pale, and that she appeared unconscious and unresponsive. He concluded she was not in cardiac arrest, since no one was doing chest compressions.

Trowbridge considered Saragusa "gravely injured," and he determined that she was the most seriously injured from the accident. Accordingly, Trowbridge sent her by ambulance to the nearest trauma center, the University of Kansas Hospital, which was about 4 miles away.

Since Barker and Charles were thrown out of their vehicle, both of them also needed to be sent to a trauma center, based on Kansas City, Kansas, EMS criteria. Trowbridge classified them as having life-threatening injuries because—having been ejected many feet from the vehicle—they could have significant internal injuries.

3

Trowbridge decided to send Barker and Charles to Truman Medical Center, a hospital on the Missouri side of the state line but only a few minutes further away than KU.

Since Fenton didn't meet the department's trauma criteria (significant blunt or penetrating trauma to the head, neck, chest, abdomen, or legs; or ejection from the vehicle), Trowbridge directed Fenton's ambulance farther away—to Overland Park Regional Medical Center. (Fenton eventually ended up at KU, but since he did not meet the trauma criteria, his destination did not affect where Saragusa would be sent.)

After deciding where to send each ambulance—and with Saragusa already on her way to KU—Trowbridge reported in to Horvat.

At this point, after overhearing that Barker and Charles were being sent to a Missouri hospital, another Kansas Highway Patrol Trooper, Jesse Johnson, objected in what Trowbridge called a "very aggressive" manner. Johnson wanted Barker and Charles kept in Kansas. Trowbridge explained how Johnson's objection ultimately led him to send Saragusa's ambulance to another hospital:

"Q. What happened?

"A. Well, I'd gone through the scene and determined that we had four patients. Three of those patients were trauma [patients] according to our protocol. After I'd decided on routing, I informed the units where they were to go, and I then gave my report to Chief Horvat, at which time Trooper Johnson jumped in.

"Q. Okay. What did Trooper Johnson do?

"A. I don't remember the exact words, but he was very aggressive in both posture and tone of voice; a lot of pointing, raised voice. I don't remember the exact words, but he voiced the fact that Saragusa and Fenton could go anywhere, but his suspects were going to go to KU.

"Q. Were there other troopers standing around, too?

"A. I wasn't aware of them at the time. But looking at the video, there were officers, other officers.

"Q. So Trooper Johnson is having this conversation. Is he telling this to you or is he telling it to Horvat or is he just . . .

"A. He's—he's pointing at me and being very aggressive about the destination determination of his suspects. I ignored Trooper Johnson and appealed to my commanding officer that any rerouting was a bad idea.

"Q. Did you tell—and I understand you're addressing your comments to your commander.

"A. That's correct.

"Q. Did you feel it was necessary at that time to take your time to explain things to Trooper Johnson?

"A. If we were going to reroute, then it had to be done quickly in order to decrease transport time. And so I thought my best option was to convince my commanding officer to leave the routing as it stood.

"Q. Now, the routing that you had determined was necessary, was that a medical decision?

"A. That was a medical decision.

"Q. And was it—was it made for the best interest of these injured people?

"A. My routing was made for the best interest for the injured people.

"Q. Do you recall saying anything like that to Chief Horvat?

"A. I told Chief Horvat—I don't remember the exact words, but the gist of it was that I made my routing for a reason, for a medical reason. I was in charge of [the] medical sector.

"Q. So you told Chief Horvat that you had made your routing decision for medical reasons. Was Trooper Johnson standing there when you told him that?

"A. Trooper John—they were standing side by side. That's how he overheard the conversation and my routing plans.

"Q. So what happened next?

"A. The incident commander told me that I should—after he considered the options, he told me that I should accommodate the officer, Trooper Johnson."

So Trowbridge changed the ambulance-routing instructions. He directed that Barker and Charles be taken to KU and that Saragusa be rerouted to Truman.

Trowbridge said that Barker, Charles, and Saragusa couldn't all be sent to KU because the local trauma centers generally each handle no more than two trauma patients at a time. Thus, Saragusa would go to Truman, which was only about 3 minutes further away.

Unfortunately, the plan didn't hold. Although EMS personnel saw Truman listed as open to trauma patients on an updated computer database, when the ambulance crew radioed to Truman, staff there said they were already handling two trauma patients and couldn't take another. Trowbridge had to give further instructions. Barker and Charles had taken the spots at KU; Saint Luke's Hospital, another Missouri hospital near Truman, was closed to further trauma patients; and Trowbridge had learned (after directing Fenton there) that Overland Park Regional was now closed to further trauma patients as well. So Trowbridge sent Saragusa to North Kansas City Hospital. She arrived there about 16 minutes after her ambulance left the accident scene.

While en route to North Kansas City Hospital—but still about 3 minutes away— Saragusa's heart stopped. She couldn't be revived.

Saragusa's estate and children (who we will sometimes refer to as the plaintiffs) filed a wrongful-death suit against the Unified Government of Wyandotte County/Kansas City, Kansas (the governing body responsible for the Kansas City, Kansas, Fire Department and EMS) and the State of Kansas (which is responsible for the Kansas Highway Patrol). Before trial, the plaintiffs settled their claims with the Unified Government, which agreed to a structured settlement in which funds would be paid to Saragusa's children over time; the last payment would come in 2044, when the youngest of the two children will turn 45.

The plaintiffs raised two main claims against the State. First, they claimed that Trooper Gruber's high-speed chase of Barker was reckless. Second, they claimed that

6

Troopers Gruber and Johnson "negligently interfered with emergency medical providers engaged in the performance of their duties by insisting the medical providers alter the ambulance routing of those injured in the crash."

The parties presented evidence and argument to a jury over a 9-day trial. The jury found that Trooper Gruber wasn't at fault for the high-speed chase. But the jury found the State 10% at fault for "failing to transport Kristin Saragusa to the nearest appropriate trauma center." The jury awarded total damages of $1.1 million to Saragusa's children and $100,000 to her estate. But since the State was only 10% at fault, the State's liability was $120,000. The district court entered judgment against the State for that amount.

The State then appealed to our court. We will add some additional factual background as we discuss each of the issues the State has raised on appeal.

ANALYSIS

I. *The Plaintiffs Had a Valid Legal Claim Against the State.*

The State makes three separate arguments that all attempt to undercut the viability of the plaintiffs' claim related to the rerouting of Saragusa's ambulance. First, the State argues that the claim should be characterized not as a negligence claim but as one "for loss of chance of survival based on negligent interference with ambulance transport." The State contends that no such legal claim exists. Second, the State argues that the Kansas Tort Claims Act, which governs claims against state government for negligent acts of its employees, provides an exception to liability, or immunity, that applies in this case. Third, the State argues that it has no liability because its duties were owed only to the public at large, not individually to Saragusa. We will consider each of these arguments separately.

A. *The Plaintiffs Presented a Valid Negligence Claim.*

The State's first argument simply tries to recharacterize the plaintiffs' claim as something it is not. The State argues that the plaintiffs seek recovery "for loss of chance of survival based on negligent interference with ambulance transport" and then argue that such a cause of action has never been recognized by a Kansas court. But the plaintiffs contend that they have simply presented a standard negligence claim—the most ordinary and well-recognized cause of action in tort law.

Indeed, at a pretrial hearing in May 2013 on the State's motion to dismiss the lawsuit, counsel for the State recognized that the plaintiffs contended that the troopers had "negligently interfered with" the EMS personnel. The State's attorney then noted that the plaintiffs must meet the requirements of a negligence claim: "[I]f there is a claim for negligence in any form, the requirements on the plaintiff are that they identify the existence of a duty owed to the plaintiffs individually, show that there was a breach of that duty, and that that breach was the proximate cause of the injury sustained by the parties, and that there were injuries." During the same hearing, the plaintiffs' attorney confirmed that they were pursuing a standard negligence claim: "The duty owed to Ms. Saragusa is the same duty that every one of us owes to every other one of us in this society, . . . that when we act, we must do so in a way that is not likely to cause harm. That is basic tort law."

The plaintiffs brought a claim for negligence. The State cannot turn the plaintiffs' claim into something else.

So did the plaintiffs have a valid negligence claim on these facts? We should perhaps first note that the negligence claim here forms the basis for a wrongful-death action. When a person is killed by the wrongful act or omission of someone else, the

8

estate or heirs of the person who was killed can bring a wrongful-death action. That action is viable only if the person killed would have had a valid legal claim had he or she lived. K.S.A. 2015 Supp. 60-1901(a). Thus, there must be some underlying and valid legal claim to support any wrongful-death action. Here, a negligence claim is the basis for the wrongful-death action.

A negligence claim must meet four requirements: (1) the existence of a duty to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) proximate causation (a sufficient causal connection between the breach of duty and the injury). *Robbins v. City of Wichita*, 285 Kan. 455, 460, 172 P.3d 1187 (2007); *D.W. v. Bliss*, 279 Kan. 726, 734, 112 P.3d 232 (2005). Whether there is a duty is a legal question that we look at independently, without any required deference to the district court. *Robbins*, 285 Kan. at 460.

"To find a legal duty to support a negligence claim, (1) the plaintiff must be a foreseeable plaintiff and (2) the probability of harm must be foreseeable." *Berry v. National Medical Services, Inc.*, 292 Kan. 917, Syl. ¶ 1, 257 P.3d 287 (2011). "A foreseeable plaintiff is one [who] is 'within the range of apprehension.'" 292 Kan. at 920 (quoting *Durflinger v. Artiles*, 234 Kan. 484, 489, 673 P.3d 86 [1983]). To put it another way, when we look at foreseeability, we take into account a common-sense perception of the risks involved; if they're sufficient that a reasonably prudent person would take them into account, then the risk of harm is foreseeable. *South v. McCarter*, 280 Kan. 85, 103-04, 119 P.3d 1 (2005).

The plaintiffs' negligence claim meets the tests for finding a legal duty. It's easy to foresee that causing a delay in medical treatment to a critically injured accident victim could cause harm. An ordinary person would understand, for example, that you shouldn't park at an accident scene in a way that would block an ambulance from leaving the scene and then leave your car unattended. And a law-enforcement officer who regularly deals with accidental injuries would well know that time is of the essence in treating a critically

9

injured accident victim. Accordingly, anyone, and certainly an officer, should refrain from interfering with medical treatment of the critically injured. Causing substantial delay in treatment by demanding rerouting of an ambulance would foreseeably cause harm to an injured person; both the plaintiff and the harm in that situation are foreseeable.

The plaintiffs had alleged not only the existence of that legal duty not to interfere with medical treatment to Saragusa but also each of the other elements of a negligence claim—breach of the duty, injury, and causation. The district court was right to allow those claims to be presented to a jury, as the plaintiffs had alleged a negligence claim that was potentially viable (depending on the jury's evaluation of the evidence).

B. *No Immunity Provision Under the Kansas Tort Claims Act Applies Here.*

Because at common law, the King—and later a state or national government— could not be sued, negligence claims against the State of Kansas are allowed only as provided by statute. The Kansas Tort Claims Act provides that negligence claims may be brought against the State, but the Act also provides several exceptions to liability. The State contends that three of the exceptions preclude liability here: (1) the enforcement-of-a-law exception in K.S.A. 2015 Supp. 75-6104(c); (2) the discretionary-function exception in K.S.A. 2015 Supp. 75-6104(e); and (3) the police-protection exception in K.S.A. 2015 Supp. 75-6104(n).

Before we look separately at each exception, we begin by noting some general concepts that apply here. Under the Kansas Tort Claims Act, liability is the rule and immunity is the exception. *Keiswetter v. State*, 304 Kan. 362, 366, 373 P.3d 803 (2016). Accordingly, exceptions to liability are narrowly construed, *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 290, 261 P.3d 943 (2011), and the State has the burden to show that it is immune from liability under a statutory exception. *Keiswetter*, 304 Kan. at 368. With those concepts in mind, we do not find that any of the exceptions apply.

10

The *enforcement-of-law exception* applies to liability resulting from "enforcement of or failure to enforce a law." K.S.A. 2015 Supp. 75-6104(c). The State contends that the troopers were merely enforcing the law by arresting Barker and Charles and then trying to keep them in their custody within the state's borders. The officers certainly had arrest powers. But the enforcement-of-law exception applies only where the plaintiff's sole claim of negligence is the enforcement or nonenforcement of the law. It does *not* apply when the state agent or agency "in enforcing or failing to enforce a law, commits some additional tortious act or omission which would be negligence at common law, and which act or omission causes damage." *Cansler v. State*, 234 Kan. 554, 568, 675 P.2d 57 (1984). In addition, to meet this exclusion, the allegedly negligent conduct must be within the scope of the law being enforced (or, at the officer's discretion, not enforced). *Collins v. Heavener Properties, Inc.*, 245 Kan. 623, 632-33, 783 P.2d 883 (1989); *Barber v. Williams*, 244 Kan. 318, 322-23, 767 P.3d 1284 (1989); *Lantz v. City of Lawrence*, 232 Kan. 492, 497, 657 P.2d 539 (1983).

Here, the State has cited no statute giving the officers any authority over the medical decision of what trauma center the various patients injured in an accident should be sent to. Just because a person is under arrest doesn't mean that the person can't be sent out of state by ambulance for emergency medical care at the direction of authorized medical personnel. The plaintiffs' claim that the troopers interfered with the medical decision of where to send Saragusa targets conduct that isn't protected by the enforcement-of-law exception: the troopers weren't doing something they had statutory authority to do when they sought to influence where the victims should be sent, let alone when they made what Trowbridge called aggressive demands.

The *discretionary-function exception* applies when the negligence claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" by a government employee. K.S.A. 2015 Supp. 75-6104(e). The State

11

contends that the troopers had the discretion to decide "if, how, and when to arrest a person." By asking to keep Barker and Charles in Kansas, the troopers were seeking to keep their suspects in custody, something ordinarily within their authority over a person under arrest. Even so, the troopers acknowledged that they can work with officers in Missouri both to detain suspects in cases like this and even to collect further evidence. But telling EMS personnel that Fenton and Saragusa "can go anywhere" (*i.e.*, to any hospital), arguing with EMS personnel who were trying to make medically based decisions, and aggressively pursuing their position until EMS and fire personnel relented went beyond matters entrusted to the discretion of law-enforcement officers making an arrest. Attempting to direct where nonsuspects receive medical attention did not involve any policy-making or discretionary function given to the troopers. See *Hopkins v. State*, 237 Kan. 601, 610, 702 P.2d 311 (1985); *Estate of Belden*, 46 Kan. App. 2d at 291-92. Accordingly, the conduct at the heart of the plaintiffs' negligence claim was well beyond the discretion of the troopers and was not protected by the discretionary-function exception.

The *police-protection exception* applies when the negligence claim is based on the "failure to provide, or the method of providing, police or fire protection." K.S.A. 2015 Supp. 75-6104(n). The State argues that this exception "bars liability based on conduct of law enforcement officers simply doing their job." The State's reading is too broad for an exception that is to be read narrowly. As our Supreme Court noted earlier this year in *Keiswetter*, 304 Kan. at 371, it "rejected an overbroad construction of the police protection exception" in *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984). In *Jackson*, the court had allowed negligence claims against a city when two fire trucks had collided when dispatched from different fire stations to the same fire. The city argued that the police-protection exception applied. The court disagreed, saying that while the exception applied to decisions on things like how many police cars should be on patrol or what fire equipment should be available, it did not immunize every negligent act by a police officer or firefighter:

"We believe [the police-protection exception] is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. *We do not believe [the exception] is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.*" (Emphasis added; original emphasis omitted.) 235 Kan. at 292.

In later cases, the Kansas Supreme Court has found the police-protection exception to apply to the determination of how to provide police protection at a hospital emergency room, *Beck v. Kansas Adult Authority*, 241 Kan. 13, 24, 735 P.2d 222 (1987), to the determination of the nature and type of police protection to provide at a special event, *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1060-61, 934 P.2d 121 (1997), and to the determination of how to supervise a work crew of inmates mowing grass outside the confines of a correctional facility, *Keiswetter*, 304 Kan. at 372-73.

In our case, the Highway Patrol had immunity for determining how many officers to send, how to deploy officers at the accident, and—either under this exception or the discretionary-function exception or both—whether to make arrests. But no statute gave them any authority to make emergency medical decisions once EMS personnel were on the scene. The plaintiffs don't allege negligence in an arrest decision; they claim negligence in interfering with the emergency medical decisions of EMS and fire personnel. The police-protection exception doesn't provide immunity against that claim.

C. *The "Public-Duty Doctrine" Does Not Preclude Liability by the State in This Case.*

In addition to the immunity exceptions in the Kansas Tort Claims Act, there's another, nonstatutory limit to the State's potential liability when a state employee breaches a duty. If the State owes the duty to the public at large, not to a specific individual, then it cannot be held liable for negligence under what's known as the public-duty doctrine. See *Keiswetter*, 304 Kan. at 365. But the State can owe a duty to an individual in several situations, including when a state employee "perform[s] an affirmative act that cause[s] injury." *Potts v. Board of Leavenworth County Comm'rs*, 39 Kan. App. 2d 71, 81, 176 P.3d 988 (2008); see also *P.W. v. SRS*, 255 Kan. 827, 835, 877 P.2d 430 (1994).

The State contends that its troopers owed no special duty to Saragusa because the troopers weren't responsible for her medical care or for the hospital-routing decisions. The plaintiffs counter that the troopers performed an affirmative act—aggressively and successfully lobbying to change the hospital-routing decisions—that harmed Saragusa.

Here, the troopers' actions fit within the "affirmative act" rule because the troopers did something more than they were obligated by statute to do. They had no duty to interfere with hospital-routing decisions at all. Compare that with *Potts*, where the plaintiffs brought a negligence action against the county based on the refusal of emergency-medical technicians (EMTs) to transport their relative to a hospital against her wishes. The plaintiffs claimed that the EMTs had a special relationship with the woman because they performed an affirmative act by responding to the call for an ambulance. By failing to take her to the hospital, the plaintiffs claimed, the woman's chance of surviving later hip surgery was reduced. But our court found the public-duty doctrine precluded liability because the only affirmative act taken by the government employees— responding to an ambulance call—was clearly within their duties under statutes or agency

14

regulations. 39 Kan. App. 2d at 82-83. In our case, however, the affirmative act taken by the troopers wasn't within their statutorily assigned duties. The officers took actions that went beyond their general duties to protect the public by arresting or detaining wrongdoers; they attempted to direct ambulance-routing decisions by arguing with EMS personnel, even stating that Saragusa could be sent to any hospital. Accordingly, the public-duty doctrine doesn't preclude the plaintiffs' claim.

II. *The Jury Could Reasonably Find That the Interference by Highway Patrol Troopers in the Routing of Kristin Saragusa's Ambulance Was a Legal, or Proximate, Cause of Her Death.*

We have already concluded, in the first section of our opinion, that the State, through these Highway Patrol troopers, owed a duty to Saragusa and that the State wasn't immune to liability for breach of that duty. We turn now to the State's contention that the plaintiffs did not meet the fourth requirement of a negligence claim—proximate causation (a sufficient causal connection between the breach of duty and the injury).

When we talk about "proximate causation," we're referring to a requirement that there be more than a mere chain of sequential events, one leading to another and then to another, in which the last one wouldn't have happened "but for" each of the preceding events. In that situation, the first event may have caused the last one—in the "but for" sense—but the sequence might be so unexpected and unpredictable that the person who caused the first event would not be held liable for the last one. That's because longstanding caselaw holds that liability for negligence arises only when the consequences of an act are probable under normal human experience, not merely possible.

Our Supreme Court explained the rules about proximate causation in *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008):

15

"The proximate cause of an injury is the cause that in a natural and continuous sequence, unbroken by any superceding cause, both produced the injury and was necessary for the injury. The injury must be the natural and probable consequence of the wrongful act. [Citation omitted.] Individuals are not responsible for all *possible* consequences of their negligence, but only those consequences that are *probable* according to ordinary and usual experience. [Citation omitted.]"

See also *State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d 1085, 1123 (D. Kan. 2014) (reviewing Kansas caselaw on proximate cause). The *Hale* court also explained "that proximate cause is ordinarily a question of fact that is reserved for the trier of fact," in our case, the jury. 287 Kan. at 324; see also *Bell*, 30 F. Supp. 3d at 1125. It is only "when all the evidence on which a party relies is undisputed and susceptible of only one inference" that "the question of proximate cause becomes a question of law" that the court can remove from the jury's consideration. *Hale*, 287 Kan. at 324.

In our case, to show proximate cause, the jury had to conclude that if the troopers hadn't requested that the suspects be kept in Kansas, Saragusa would have received prompt medical care and would have survived. In addition, those consequences had to be probable according to ordinary and usual experience. The State contends that the district court should have overturned the jury's verdict because the plaintiffs had not shown that the conduct of the troopers had been the proximate cause of Saragusa's death. The State provides three separate arguments in support of its claim.

First, the State argues that the evidence did not show that Saragusa's death was the natural and probable consequence of the troopers' request to keep Barker and Charles in Kansas. But Trowbridge testified specifically that the only reason Saragusa was rerouted was because of the troopers' forceful requests. In addition, even though Kansas City, Kansas, fire and EMS personnel had policies requiring that the most serious victim be sent to the closest trauma center, the troopers acknowledged that it was common for EMS personnel to accommodate requests to keep suspects in the state. The troopers also agreed

16

that they shouldn't interfere with medical decisions, and Trowbridge testified (and other evidence supported) that one or more troopers were standing within earshot when Trowbridge told Horvat that changing the routing would be a bad idea and that Trowbridge had made the routing decision for medical reasons. In these circumstances, it was reasonably foreseeable that the fire and EMS personnel would alter the routing decision in response to the troopers' forceful requests *and* that delays in providing care to a critically injured person could have adverse medical consequences.

As we have noted, proximate causation is normally a factual question for resolution by the jury; the jury in this case found in favor of the plaintiffs. In our opinion, a reasonable jury could reach the conclusion that the plaintiffs had sufficiently proved that the troopers' actions were the proximate cause of the rerouting of Saragusa's ambulance and ultimately of her death.

Second, the State argues that the plaintiffs relied on what's known as the "loss-of-chance doctrine" to prove causation in the case; the State contends the doctrine doesn't apply outside the context of medical-malpractice cases, so the plaintiffs should not have been allowed to rely on it. Under the loss-of-chance doctrine as applied in medical-malpractice cases, an injured plaintiff can recover damages by proving that a substantial chance of survival or a better recovery was lost due to the defendant's negligence—rather than having to show that the harm actually suffered, such as death, was caused by the defendant's negligence. Consider a hypothetical case in which a patient dies from cancer, but an expert witness testifies that had the patient been properly diagnosed and treated, the patient would have had a 40% chance of recovery. Under traditional negligence principles, the patient's estate could not recover in a wrongful-death negligence action because it was not more probable than not that the patient would have survived even with proper treatment. Under the loss-of-chance doctrine, though, recovery would be allowed for the 40% chance that was lost due to negligence. See *Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1274-76 (10th Cir. 2013); *Pipe v. Hamilton*, 274 Kan. 905, 56 P.3d

17

823 (2002); *Delaney v. Cade*, 255 Kan. 199, 873 P.2d 175 (1994). The loss-of-chance doctrine has no logical application, though, when the injured person has a greater than 50% chance of survival. In that situation, traditional negligence principles apply. *Delaney*, 255 Kan. at 208.

In our case, the jury found factually, in response to a question on its verdict form, that Saragusa would have had an 80% chance of recovering if she had "received proper medical care," meaning had she been sent to KU Hospital, the closest trauma center. Accordingly, the loss-of-chance doctrine doesn't apply; in cases like this one, we simply apply the traditional rules of negligence. *Delaney*, 255 Kan. at 208.

Third, the State argues that the plaintiffs did not present proper evidence to support the claim that Saragusa would have survived had she been routed to KU Hospital, the evidence upon which the jury would have based its finding of an 80% chance of recovery. Specifically, the State argues that Tracy McDonald, a registered nurse who testified for the plaintiffs, wasn't qualified to give expert opinions about Saragusa's chance of survival had she been taken to KU Hospital.

Whether expert testimony is admitted at trial is generally a matter of discretion for the district court, and an appellate court overturns its decision to admit expert testimony only if the district court abused its discretion. *State v. Gaona*, 293 Kan. 930, 939, 270 P.3d 1165 (2012); *Puckett v. Mt. Carmel Regional Medical Center*, 290 Kan. 406, 444, 228 P.3d 1048 (2010). The district court abuses its discretion if no reasonable person would agree with its decision or the decision is based on a factual or legal error. *State v. Marshall*, 303 Kan. 438, Syl. ¶ 2, 362 P.3d 587 (2015); *Bereal v. Bajaj*, 52 Kan. App. 2d 574, 580, 371 P.3d 349 (2016).

The admission of expert-witness testimony is provided for in K.S.A. 60-456. At the time of this April 2014 trial, it allowed an expert to testify about matters "within the

18

scope of the special knowledge, skill, experience or training" of the expert so long as the testimony is "based on facts or data perceived by or personally known or made known to the witness at the hearing." K.S.A. 60-456. In addition, under longstanding caselaw, an expert opinion must be helpful to the jury to be admissible. *Mooney v. City of Overland Park*, 283 Kan. 617, 622, 153 P.3d 1252 (2007).

McDonald was not merely a nurse; she was also the trauma program manager for the KU Hospital trauma center, a position she had held for 5 years. Before that, she had been the trauma program manager at Truman Medical Center, and she had worked in various positions at the Truman trauma center from 1994 until she left to join KU. And at KU, one of McDonald's job duties was to analyze outcomes of patients at KU's trauma center as compared to patients of other trauma centers throughout the United States. In doing that work, she compared patients with similar injuries and determined their mortality and survival rates.

McDonald testified that each injury is scored on a standardized scale that all trauma centers in the country use. The injury scores for each patient are totaled up, and the total scores are placed in a database along with information about the severity of the injuries and whether each patient survived. Drawing from this database, McDonald said that she could predict a trauma-center patient's chance of surviving a set of injuries.

After giving this background, McDonald testified about the extent of Saragusa's injuries and concluded that, based on patient outcomes with similar injuries, Saragusa would have had an "excellent" chance of surviving if she had been taken to the closest appropriate trauma center.

The State's primary argument against McDonald's testimony is that only a medical doctor could provide any opinion related to Saragusa's chance of survival. But through her work in managing the trauma program at two large Kansas City area hospitals,

19

McDonald had "special knowledge, skill, experience or training" in the survival rates of individuals with varying levels of injury on admission to a trauma center. The State has not argued about the other standard in K.S.A. 60-456, *i.e.*, that the opinion be "based on facts or data perceived by or personally known or made known to the witness at the hearing." Rather, the State's argument is that a nurse/program manager simply isn't qualified to give an opinion about survival chances.

We conclude that the district court did not abuse its discretion in admitting this testimony. The district court determined that McDonald was qualified based on 20 years of work in area trauma centers, including as trauma program manager at two hospitals. Her testimony was helpful to the jury in understanding matters well outside the experience of an average person.

In addition to its overall objection to the admission of McDonald's opinion testimony, the State makes some additional complaints about her testimony, but we do not find any trial-court error:

- The State argues that McDonald violated a pretrial order that she not quantify the degree of Saragusa's chance of survival when she said the chance would have been "excellent." Before trial, after the State tried to exclude McDonald's testimony altogether, the district court limited the conclusions she could present to the jury. McDonald had planned to testify that Saragusa had lost something in the range of a 58% to 81% chance of survival. The district court considered testimony about an exact percentage something that only a medical doctor could provide, so the court said that she could only express an opinion in words, not numbers, such as "a good chance of survival or no chance of survival or a small chance of survival." We find her testimony—that Saragusa had an "excellent" chance of survival—to be within the limits set by the district court.
- The State argues that McDonald testified about patients at KU who survived similar or worse injuries that weren't disclosed before trial. The State does not

cite anywhere in the transcript where it offered this objection during or before McDonald's testimony; rather, the State's actual objection was that the plaintiffs hadn't established that Saragusa's injuries were similar to the ones McDonald was describing. By failing to raise this objection at trial, the State waived its right to pursue the issue on appeal. See *City of Neodesha v. BP Corporation*, 50 Kan. App. 2d 731, 759, 334 P.3d 830 (2014), *rev. denied* 302 Kan. 1008 (2015).

- The State argues that the court shouldn't have allowed a timeline to come into evidence during McDonald's testimony because it wasn't shared with the State before trial. In admitting the exhibit, the district court said that the information in it came from McDonald's written report, which was shared before trial, so the State could not have been unfairly surprised or prejudiced. The admission of exhibits not disclosed in advance of trial is a discretionary matter for the trial court; we see no abuse of discretion here. See *Canaday v. Midway Denton U.S.D. No. 433*, 42 Kan. App. 2d 866, Syl. ¶ 1, 218 P.3d 446 (2009).

- The State argues that the plaintiffs didn't remove all references to the percentage chance of Saragusa's survival from exhibits submitted to the jury, despite a court order to do so. In one case, Exhibit 112, our review shows that the percentage was marked out before the exhibit went to the jury. In another, though, Exhibit 100, it appears that although a percentage was blacked out in one spot, it remained in a graph. But we find no error given the way the State presented this issue to the trial court. After presenting its case, the State said it would like to have portions of McDonald's report redacted to comply with the ruling, but the State's attorney wasn't yet prepared to say where redactions needed to be made. The State's attorney said he could "have that done tomorrow." The district court then said that it would let the "report go in as it is right now" but invited the State to make a formal motion the next day, the day the case would actually go to the jury for deliberation. The State did not raise the issue again, even though the case didn't go to the jury until around noon. We find that the State waived this issue

21

by failing to make a timely and specific objection (*i.e.*, identifying the specific portions of the document that it wanted redacted). See K.S.A. 60-404.

III. *The State Has Not Shown Error in the District Court's Conclusion That the $500,000 Cap on Negligence Damages Against Governmental Entities Had Not Already Been Met.*

There's a limit on the damages that may be awarded under the Kansas Tort Claims Act, and the State contends that the limit was reached before Saragusa's claims against the State were even tried. The specific damages limit comes from K.S.A. 75-6105(a), which provides that "the liability for claims within the scope of this act shall not exceed $500,000 for any number of claims arising out of a single occurrence or accident." The State contends that these payments, made before the jury trial, had already exceeded $500,000:

- Jayson Fenton, who drove the car Saragusa was in, brought his own suit against the State. According to the State, the jury in Fenton's case agreed with his claim that Trooper Gruber had been negligent in chasing Barker's car at high speeds on a speeding infraction, with the jury finding the State 10% at fault and Barker 90% at fault. The State says it paid the judgment, which totaled $8,112.58 with court costs included.

- Barker and Charles were both treated at KU Hospital, and the State ended up paying $168,832.29 for their medical care.

- The plaintiffs in our case settled their claim against the Unified Government; the State contends that the value of that settlement was $462,260.40, a figure the plaintiffs dispute.

The district court rejected the State's argument and entered judgment against the State for the amount the jury decided on: $120,000.

Whether these amounts count toward the $500,000 damages cap depends on the interpretation of the statutory language in K.S.A. 75-6105(a). We consider statutory-

interpretation questions independently, without any required deference to the district court. *State v. Jordan*, 303 Kan. 1017, 1018, 370 P.3d 417 (2016).

The plaintiffs agree that the State's payment to resolve the Fenton lawsuit, $8,112.58, counts toward the cap. But the parties don't fully agree about the payments to KU Hospital and the value of the plaintiffs' settlement with the Unified Government.

The payments to KU Hospital for the cost of care for Barker and Charles don't count toward the statutory cap. The statutory cap applies only to "claims within the scope of this act." K.S.A. 75-6105(a). And the medical claims weren't paid based on a negligence claim Barker or Charles made against the State. They were paid because another statute, K.S.A. 2015 Supp. 22-4612(a), provides that a law-enforcement agency must pay for medical care provided to persons in the agency's custody. See *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1006, 348 P.3d 602 (2015). So these payments for health care don't count toward the cap on damages under the Kansas Tort Claims Act.

We now turn to the plaintiffs' settlement with the Unified Government. Both the plaintiffs and the State agree that the settlement amount counts toward the cap; they disagree about the value of the settlement.

The State contends the value of the settlement is $462,260.40. The plaintiffs contend that the present value of the settlement—under which payments are scheduled until 2044—is $325,000, a figure the plaintiffs' attorney cited (without objection) before the district court. Indeed, in the State's memorandum in support of its motion in the district court to dismiss the suit based on the statutory cap, the State noted "that the present value of the settlement is only $325,000." Neither side presented an affidavit or any evidence to the district court on the value of the settlement. The district court accepted the $325,000 figure in its ruling.

23

As the appellant, the State has the burden to show that the district court was wrong to accept the $325,000 figure. The State has cited neither to evidence in the record nor legal authority showing that the district court erred. The State has pointed to an exhibit given to the district court at the settlement hearing that shows the stream of payments agreed upon in the settlement. The bulk of the payments go to Saragusa's two children; one receives a series of payments ending in 2041, and the other receives a series of payments ending in 2044; the end of the payments coincides with each child's 45th birthday. The final payment amounts on those dates are $36,244.43 (in 2041) and $40,015.97 (in 2044).

The State is arguing that the total amount of the scheduled payments should count toward the cap. That makes no sense. The value of a $40,000 payment in 2044 will not be the same as the value of a $40,000 payment today. The value of a financial settlement, like the value of other monetary amounts, is generally its present value, not its value over time. See K.S.A. 2015 Supp. 40-461(c), 40-462(c); K.S.A. 2015 Supp. 84-1-201(28); K.S.A. 2015 Supp. 84-2a-103(1)(u); 25A C.J.S., Damages § 454. Since it's illogical to value the payments based on their gross value, irrespective of the date they will be paid, and since there is no evidence in the record showing that the district court was wrong about the present value of the settlement, we find that the district court did not err when it valued the Unified Government settlement at the stated present value of $325,000.

Given these rulings, the total amount already paid that counted toward the cap was $333,112.58 ($325,000 plus $8,112.58). That left another $166,887.42 in potential recoveries before reaching the cap limit of $500,000. Since the plaintiffs' recovery, $120,000, is less than $166,887.42, the judgment does not exceed the statutory cap.

24

IV. *The State Has Not Shown Good Cause to Order a New Trial.*

The State has two additional bases upon which it contends we should order a new trial. First, the State contends the jury instructions were so flawed that a new trial must be ordered. Second, the State argues that the district judge initially assigned to the case had a serious conflict of interest.

The jury instructions are a bit of a mess, but that's mostly because the State asked for instructions that didn't fit the case. The prime example is that the State asked the court to give the jury an instruction based on the pattern jury instruction for a claim of tortious interference with a contractual relationship. But that wasn't the claim the plaintiffs were making.

The State's objections on appeal center around instruction No. 16:

"INSTRUCTION NO. 16
"NEGLIGENT INTERFERENCE

"The plaintiffs may recover damages from the defendant for negligent
interference in the emergency medical care and ambulance services and transport of
Kristin Saragusa if plaintiffs prove[]:
        "1. The existence of a duty for the emergency care, treatment and transport of a[]
        person needing trauma services;
        "2. The defendant's knowledge thereof;
         "3.The absence of justification; []
        "4. Damages resulting therefrom[;]
        "5. And that these acts were done by Master Trooper Gruber or Master Trooper
        Johnson, or both."

That instruction was clearly based on the pattern instruction for a claim of tortious interference with a contract, substituting "for negligent interference" in care and transport

25

for "tortious interference with an existing contract" and substituting the existence "of a duty" for the existence "of a contract." See PIK Civ. 4th 124.91.

More importantly, Instruction No. 16 also was identical to an instruction proposed by the State with two exceptions: (1) the State had an additional element, requiring that the plaintiffs prove "[t]he defendant's intentional bringing about of its breach"; and (2) the plaintiffs had to prove that the conduct of the troopers was "malicious." So unless the district court erred in those two respects, any error here was invited by the State, which proposed this jury instruction. A party cannot challenge on appeal an error it invited the court to make at trial. *City of Neodesha*, 50 Kan. App. 2d at 748.

The changes the district court made to Instruction No. 16 did not introduce error. The State makes no contention on appeal that it was correct in its assertion that the plaintiffs had to prove malicious conduct (an intent to do harm without just excuse). And its argument that *intentional* conduct would be required for the plaintiffs to recover is simply another attempt at transforming a *negligence* claim into something much harder to prove. A negligence claim, by definition, is based on an unintentional action that causes injury. See *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 334-35, 918 P.2d 1274 (1996) ("Intent is irrelevant in the simple negligence analysis."). So the elimination of a requirement for intentional conduct—in a negligence case—did not introduce error. If Instruction No. 16 was otherwise in error, that error was invited by the State.

The State also argues that the instructions were inconsistent with the verdict form—an objection it did not make at trial. When an objection is not made at trial, the objection is waived unless the instruction is in clear error. See K.S.A. 2015 Supp. 60-251(d)(2). If an error was made, the party claiming error still has the burden to prove that the error affected the trial's result. See *In re Thomas*, 301 Kan. 841, 846, 348 P.3d 576 (2015); *Hiestand v. Amalgamated Meatcutters*, 233 Kan. 759, 760, 666 P.2d 671 (1983).

The verdict form asked whether the jury found the State "to be at fault for failing to transport Kristin Saragusa to the nearest appropriate trauma center." The form then asked the jury to assess fault to the State and to the Unified Government of Wyandotte County if it found the State at fault. The jury assessed 90% of the fault to the Unified Government and 10% to the State. The State argues that the verdict form didn't track with the "negligent interference" language in Instruction No. 16. Even so, in addition to Instruction No. 16, the jury was given standard instructions on causation, negligence, and comparative fault. And the attorneys argued and explained the claims and defenses in closing argument, after the instructions were read to the jury. The State's attorney specifically referenced the instruction on negligence, Instruction No. 10: "Negligence is the lack of reasonable care. It is the failure of a person to do something that a reasonable person would do, or doing something that a reasonable person would not do, under the same circumstances. . . ." The State's attorney told the jury to apply that definition "to the claim for negligent interference with the transport of Ms. Saragusa."

Considering only the instruction errors claimed on appeal that were not invited by the State, we find no clear error in the district court's jury instructions. The jury got appropriate instructions on the concepts of negligence, causation, and comparative fault, and the State has not convinced us that even if there was some error in the jury instructions (other than error invited by the State), that error affected the trial's result.

The State's final argument is that the judge originally assigned to the case had such a significant conflict of interest that a new trial should be ordered. The State's argument relates to District Judge William P. Mahoney. Mahoney was first assigned to preside over the case in October 2010 after the judge previously assigned to it retired. Mahoney had become a judge earlier that year.

Before becoming a judge, Mahoney had served as the guardian ad litem for Saragusa's children in connection with the estate of their mother. Mahoney filed a report

27

to the court indicating that he had met with the children, their father, and an attorney; Mahoney reported that the father was an appropriate person to serve as the estate administrator.

The State argues that Mahoney had a duty to recuse himself from handling this lawsuit because he had previously served as the guardian ad litem to the children. The State suggests that it only discovered this conflict of interest shortly before trial: "After discovering Judge Mahoney's conflict, the State notified Plaintiffs' counsel, who notified Judge Mahoney, who in turn recruited Chief Judge R. Wayne Lampson to take over the case the week before trial started." As the State notes, Judge Lampson took over the case and presided over the trial, which began April 28, 2014. In its brief, the State says that Judge Lampson then did not continue the trial setting "[d]espite the bombshell that had just landed in the middle of this case."

The State's characterization of the matter as a "bombshell" development is a bit histrionic. Judge Mahoney had disclosed his role in the probate estate at an on-the-record hearing held in May 2012, nearly 2 years before trial. That hearing was held to consider approval of the settlement between plaintiffs and the Unified Government. Judge Mahoney interrupted the proceedings before taking testimony on the settlement to explain his prior involvement:

> "Before I [hear testimony], though, I would note for the record that, at the time that this incident occurred, my office was across the hall from [plaintiff's counsel].

> "I actually, on the probate matter that was filed to try to get this case going to get [the father] appointed so he could file this case, I was appointed as the [guardian ad litem] for the kids for the purposes of that hearing. I did meet with him. I talked with the kids in the basement. It's been 4 years since that time.

"I would say that, even at that time, I didn't know as many specifics about the case as I just heard from [plaintiff's counsel] today. I just knew there was a high-speed chase. I never heard the controversy over medical care after the accident at that time. I'm not sure that even [plaintiff's counsel] may have known that at that time, either.

. . . .

"But I just wanted to make sure that that was clear on the record, that I had acted as a GAL for these children in that particular case. I don't think that precludes me from approving this settlement. I just wanted to make sure that was part of the record."

The State was represented by an attorney at that hearing, and the State's attorney raised an objection to the form of a document given to the court to approve the plaintiffs' settlement with the Unified Government. But neither the State's attorney nor anyone else objected to Judge Mahoney's role in presiding over the lawsuit at that hearing—or until the State raised the matter nearly 2 years later and on the eve of trial.

Even so, we'll assume for the purposes of our decision that Judge Mahoney should have recused. That still does not mean that we should now throw out the jury's verdict and start over. Even in a criminal trial, where a defendant's life and liberty may be at stake, reversal—based on a judge presiding over a case when he or she should have recused—"is not required unless the judge's conduct actually prejudiced [the defendant's] rights." *State v. Schaeffer*, 295 Kan. 872, 876, 286 P.3d 889 (2012). And here, the State has shown no prejudice.

Although the State contends that Judge Mahoney issued key rulings against the State, all of his legal rulings were subject to change once Judge Lampson took over, and all of the district court's legal rulings have been subject to review on appeal. The State notes that Judge Lampson initially declined to review some of Judge Mahoney's rulings immediately in advance of or during the trial. But he "reserve[d] the right" to change the

29

rulings as he heard the evidence presented at trial. He also said that he "certainly [would] entertain comments by both of [the parties] at the close of the plaintiff's evidence depending on what I hear." That he ultimately found Judge Mahoney's rulings legally sound "[a]fter consideration of the pleadings and the issues raised by the parties" does not mean that he simply rubber-stamped earlier rulings. And our court has fully reviewed the rulings of the district court that have been challenged on appeal. The State has not shown that any conflict of interest of Judge Mahoney prejudiced the State's rights in this lawsuit.

Because we have found no reversible error, we affirm the district court's judgment.